BLAKESBURG SAVINGS BANK, Appellant, v. LOUIS BLAKE et al., Appellees.

March 5, 1929.

*Heindel & Hunt,* for appellant.

*Thomas J. Bray,* for appellees.

Kindig, J.—Louis Blake, one of the appellees, was a merchant at Blakesburg, and the appellee Zella M. Blake is his wife. Hereinafter, the term ''appellee'' will be applied to Louis Blake alone, because the subject of the discussion only incidentally includes Zella M. Blake.

During the conduct of his business, appellee became indebted to the appellant, Blakesburg Savings Bank. In addition to the foregoing obligations, appellee owed money to various other creditors. On October 9, 1924, appellee transferred to appellant a promissory note in, the principal sum of $1,582, executed by Marion Bailey and Lorena Bailey, together with a mortgage securing the written promise to pay. Guarantee of the Bailey indebtedness was made by appellee. Furthermore, at that time appellee was obligated to the bank on two other notes, in the amounts of $4,825 and $400, respectively. Thus, the total liability of appellee to appellant, on October 9th, was $6,807.

Immediately, appellee commenced selling the appellant property, for the purpose of reducing the financial burden. So, in August, 1924, a livery barn and lot were transferred by appellee to appellant, for the consideration of $500, which sum was

credited on the above amount due. Apparently appellee was not able to liquidate, and on October 9, 1924, Walter Abegg called appellee over to the appellant bank, for the purpose of discussing the financial situation. Concerning what was said and done there is in dispute. Each litigant has his own version. Testimony on the part of appellee tends to prove the following facts: Abegg was appellant's managing officer. At the inception of this conference, appellant, through Abegg, demanded full payment of the entire amount due. Appellee said that he could not meet the demand. A suggestion was made by Abegg that appellee borrow sufficient money elsewhere, but again appellee announced his inability so to do. Then a final and more threatening demand was made by appellant, through its officer aforesaid, which prompted appellee to suggest that it would be necessary for him to go through bankruptcy. This was not to appellant's liking, and the managing officer, Abegg, intimated to appellee that creditors in a bankruptcy proceeding will obtain but little from the trust assets, as the attorneys involved would consume most of the funds in fees, costs, and expenses. Whereupon, appellee expressed the opinion that the only way he could satisfy appellant's claim was by selling the store. Pursuing this scheme for such sale, appellee stated that he would be glad to have appellant procure a buyer. Resultantly, appellant expressed its willingness to purchase part of appellee's property itself, and, as will hereinafter be seen, negotiated for and bought the remainder thereof. The first portion of appellee's property thus purchased by appellant, as indicated, was the store building and lot, for $1,000, and the fixtures in the store for $600. All that was credited upon the indebtedness aforesaid.

Inquiry then was made by appellant concerning the value of the merchandise, and appellee estimated the same at $6,000. Succeeding this, Abegg said to appellee that he did not believe the stock worth that much, but appellee replied that he had been carrying a $15,000 stock. Appellant, through Abegg, then asked concerning the price appellee would make. Response to that inquiry on appellee's part was to the effect that he would make "a real price." That proposal caused appellant's representative, Abegg, to suggest that he might buy the property himself, for the bank. Consequently, appellant and appellee agreed that an invoice should be made of the stock, and if the amount thus

appraised was satisfactory, a sale would result. If, on the other hand, the total value thus found was not to appellant's liking, then, according to appellee, there was to be no contract. However, appellant asserts, contrary to appellee's claim, that in such event the stock was "to be disposed of at the best advantage possible for the benefit of the creditors."

Accordingly, an invoice was made by appellee, his clerk, Ida Tubaugh, and a Miss Frederick, who was working in another store. Said latter valuer was employed at the suggestion of appellant. Within a few days, the invoicing was completed. During the progress of making the valuation, appellant prepared a deed for the lot above mentioned, and a bill of sale for the fixtures and merchandise. These instruments were signed by appellee and his wife, and the delivery thereof made to appellant. Neither party, however, relies upon that bill of sale in the present litigation, because it did not make an absolute disposition of the merchandise stock being invoiced, but rather, future disposal thereof was dependent upon whether or not the valuation of the goods was satisfactory to appellant.

When the invoice was completed, it was found that the merchandise was worth approximately $6,178.58. As soon as the invoice was finished, Abegg, acting for appellant, took the same to an adding machine, for the purpose of making a total. Shortly after doing this, Abegg went to the store, and delivered a copy of the adding machine figures to appellee. While so doing, appellant asked appellee for the door keys and the combination to the safe. Such information concerning the safe was given appellant by appellee, and the keys were immediately delivered, in accordance with the request. Moreover, appellant employed the said Ida Tubaugh to operate the store, and, on the occasion just mentioned, he said to her, in the presence of appellee: "Now it [the merchandise] is ours. Do not let anything go out of there [the store] without the money." Thereupon, the bank took possession of all the property, and operated the business under the following name: "Farmers' Cash Store." Throughout the negotiations, appellant had a list of appellee's creditors, and promised to pay all obligations to third persons, in the event the property aforesaid was purchased. Included within the foregoing proposition, in addition to the liquidation of third-party debts, appel-

lant consented to satisfy and discharge all financial claims which it had against appellee.

By way of answer to appellant's petition, appellee, in accordance with his theory, filed a counterclaim for the balance of the property sale price above named, after allowing credit for the indebtedness due the bank and moneys paid out by it to appellee's creditors. On the other hand, it was appellant's claim that it agreed to take over the stock of goods above described, and pay appellee's debts in the sum of $1,296, on the basis of 75 cents on the dollar. Also, appellant urged that, under the contract, appellee was to pay all other indebtedness, including $1,000 to Abegg. Consistent with its contention, appellant instituted suit against appellee to recover $420.81, alleged to be an amount paid on appellee's indebtedness in excess of the agreed assumption thereof.

Thus in a general way have been stated the broad issues between the parties. Manifestly, the jury found the facts in accordance with appellee's contention, and a verdict was returned by that body against the appellant. Unless the result can be obviated because of the errors alleged, the verdict and judgment thereon must stand. Appellant's exceptions will now be considered in the order made.

I. It is first urged by appellant that there is a variance between the pleading and the proof. To more definitely particularize, appellant says that appellee declared upon an express contract, but established an implied one only. Basis for this argument is alleged to be in the following declaration found in the counterclaim, to this effect: "Contract in parol." For the purposes of this discussion, we assume, without deciding, that a "contract in parol" does not include an implied contract. Was there, then, a variance between the pleading and the proof? We think not.

Implication was not required, to complete the agreement between appellant and the appellee. An offer was made by appellee to sell the merchandise before described at the invoice price. According to appellee's version, appellant expressed its willingness to make the purchase, provided that the invoice price was satisfactory. At the conclusion of the invoice, appellant, through its officer, tabulated the totals, made a copy thereof for appellee, and asked for the keys and the combination to the safe. Simul-

taneously, appellant's authorized agent said to the clerk he had hired: "Now it [the merchandise] is ours. Do not let anything go out of there [the store] without the money." What was there said to the clerk was in the presence of appellee, who had just delivered to appellant the keys, and given the combination to the safe. Hence, appellee's offer aforesaid was expressly accepted by appellant.

Acceptance may be expressed by different words, under various occasions. Any language that unqualifiedly and unequivocally expresses the thought is sufficient. Necessity of the occasion did not demand that appellant use the sentence: "I accept." His intention in that regard could be made known by any words or language which, under the facts and circumstances, amounted to and were synonymous terms. Wherefore, under the conditions here involved, when appellant totaled the invoice, gave a copy thereof to appellee, demanded the keys, asked for the combination to the safe, and said to the clerk, in the presence of appellee, "the store is ours," an acceptance resulted through language just as express as if the style "I accept" had been used.

Within the course of the multitudinous business transactions taking place every day in this country, wherein the ignorant and the learned, the experienced and inexperienced, take part, it would result in chaos and confusion if contracts would not be made except by mere technical expressions. *Coad v. Rogers*, 115 Iowa 478, approves of these words:

" 'The language of the acceptance should be such as would leave no avenue of escape for the party using it; for the obligation of a contract, to be binding, must be mutual. If the acceptor does not bind himself by the language of the acceptance, no contract will be created binding the other party.' "

Likewise, it is said in *Lamson v. Horton-Holden Hotel Co.*, 193 Iowa 355, reading on page 361:

"True, as we have said, there must be mutual assent to the terms and conditions of a valid agreement; but how is that assent to be shown or established? Adopting the language of Mr. Bishop, found in Chapter 12 of his work on Contracts, page 126, the concurrence of the minds of the parties may be evidenced 'by mutual written or spoken words; by offer accepted in terms * * * .' "

Clearly, appellee's proof meets all the requirements of that definition. Those demands named in the *Coad* case were fully met by the words used by appellant when he took possession of appellee's store. Therefore, the offer and acceptance became and were a binding contract, from which appellant could not escape. There is no inconsistency between the doctrine just announced and that contained in *Wilson v. Gibbs*, 180 Iowa 491; *Heim v. Ressel*, 162 Iowa 75; *Kuehl v. Town of Bettendorf*, 179 Iowa 1; and other similar cases.

So appellant is not entitled to a new trial because appellee did not prove the allegations of his counterclaim.

II. Complaint is made in the second place because the court did not properly limit appellee's proof in Instruction No. 8 to the parol agreement above named: that is to say, in the charge,  the district court told the jury that appellee admitted the one-time existence of two instruments known respectively as the Bailey and Blake notes, and also his previous liability on the former as a guarantor, and on the latter as a maker. Continuing this statement of the facts, the trial court informed the fact-finding body that appellee's defense against present liability on these documents is full payment and satisfaction. Appropriately, the court then instructed that the burden of proof in this regard was upon the appellee.

Nevertheless, appellant says, he is entitled to reversal because the court did not therein limit appellee's substantiation of said "payment and satisfaction" to the particular method alleged in the answer. It is to be remembered, in the answer allegation was made by appellant that the "payment and satisfaction" aforesaid was by the sale of the merchandise under the parol agreement, at invoice price. After carefully reading the entire instructions, we are constrained to hold that there is no merit in appellant's contention. Not all the directions to the jury can be placed in a single paragraph. Necessarily, then, the trial court's charge must be considered in its entirety. When this is done, appellant, in the case at bar, has no just cause for objection; for in Paragraph 4 of the instructions the court plainly explains appellee's claim in reference to the payment and satisfaction of the indebtedness in question by and through the sale of the merchandise to appellant at invoice price. Succeed-

ing Paragraph 8, about which complaint was made, as previously explained, the court informed the jury, in Paragraph 10, that appellee claims said Blake and Bailey notes were paid and satisfied through the sale to appellant of the store building for $1,000, fixtures for $600, and the merchandise at the invoice price.

Plainly, therefore, appellant's criticism has no just foundation, because the exact theory now advocated by him was, in fact, presented to the jury. *Duncan v. Gray*, 108 Iowa 599, cited by appellant, is not inconsistent with this view, when considered in the light of our previous discussion relating to the question of variance between pleading and proof.

III. Finally, appellant predicates a grievance upon Instruction No. 12, because it did not limit appellee's right to recover, under the counterclaim, to the contract alleged therein, but permitted the jury to find for the appellee if he established his contract "substantially as alleged and testified to by him."

No objection is made by appellant to the first part of the court's requirement, to the effect that appellee must prove the purported agreement "substantially as alleged." Exception is taken to that part of the court's language first quoted, reading as follows: "and testified to by him." Returning again to his original theory concerning the variance between the pleadings and the proof, appellant urges that the court's quoted words, thus used, permitted the fact-finding body to render a verdict for appellee on a counterclaim alleging an express contract, while the evidence tended to substantiate an implied agreement only. To put the thought in another way, appellant removed the word "and," and substituted therefor the word "or." He would have that language of the trial court changed to read this way: "Substantially as alleged *or* testified to by him." Surely, this is unfair to the district court. Said tribunal intended "and," and not "or." If, then, the contract alleged was not proven, there could be no recovery; and conversely, appellee would not be entitled to succeed by establishing some agreement not alleged in the counterclaim. Merely testifying to the contract was not sufficient. More was required. Such testimony must relate, under the instructions, to the contract alleged in the counterclaim. Redress was due appellee in the event he proved the particular

contract named in his pleading. Nothing else was intended by the trial court, and nothing else was, in fact, said.

Error consequently does not appear at this juncture.

Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed*.

ALBERT, C. J., and EVANS, FAVILLE, and WAGNER, JJ., concur.